# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**LARRY TREASTER,**

        **Plaintiff,**

        **v.**                             **Case No.  05-2061-JWL**

**HEALTHSOUTH CORPORATION d/b/a**
**MID-AMERICA REHABILITATION**
**HOSPITAL and DANIEL R. WILSON, M.D.,**

        **Defendants.**

_____

## MEMORANDUM AND ORDER

This is a medical negligence case arising from a fall plaintiff Larry Treaster suffered while he was a patient at defendant HealthSouth Corporation d/b/a Mid-America Rehabilitation Hospital ("Mid-America").    Defendant Daniel R. Wilson, M.D., was plaintiff's treating physician as well as the hospital's medical director at the time of the fall.    This matter is currently before the court on Dr. Wilson's and Mid-America's motions for partial summary judgment (docs. #84 & #86).    For the reasons explained below, Dr. Wilson's motion for summary judgment is granted with respect to theories (3), (6), (10), (11), (12), and (13).    Mid-America's motion for summary judgment is granted with respect to vicarious liability based on Dr. Wilson's alleged medical malpractice, vicarious liability based on Dr. Wilson's alleged negligence as the hospital director with respect to theory (14), and vicarious liability based on the nursing staff's alleged negligence with respect to theories (5) and (11).    The motions are otherwise denied.

## STATEMENT OF FACTS[1]

On January 9, 2003, plaintiff fell approximately ten feet onto a concrete surface while he was washing out a cement truck at work.  He was taken to St. Luke's Hospital where he was diagnosed with a left frontotemporal parietal contusion with a subdural hematoma.  The subdural hematoma required a craniotomy to be performed for drainage.  After plaintiff's surgery, his physicians informed his wife, Sheryl Treaster, that he would have serious memory loss and would require considerable rehabilitation.  When plaintiff woke up after surgery he did not recognize anyone, and he was very impulsive, confused, and disoriented.  His condition eventually improved enough that he was discharged from St. Luke's and transferred to Mid-America on February 3, 2003.  While at Mid-America, he fell and broke his hip on February 8, 2003.  It is the events that transpired during this six-day period at Mid-America that are at issue in this lawsuit.[2]

During plaintiff's stay at Mid-America, his attending physician was Dr. Wilson.  Dr. Wilson also was Mid-America's medical director.  When plaintiff was admitted to Mid-America on February 3, he was placed in a room with a large window near the nursing station

---

[1] Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to plaintiff, the nonmoving party.

[2] After plaintiff fell and broke his hip, he was transferred to North Kansas City Hospital. He later returned to Mid-America, but the events that transpired during his second stay at Mid-America are not at issue here.  The court's discussion pertains solely to his initial stay when he broke his hip.

to facilitate monitoring.   Rugeania Coates, one of Mid-America's nurses who cared for him, stated that it was approximately ten feet from the nursing station to his bed.   Dr. Wilson conducted a history and physical of plaintiff upon his arrival at the hospital.   Dr. Wilson approached plaintiff's treatment by first noting that plaintiff had a severe brain injury resulting in confusion, agitation, and restlessness.   In Dr. Wilson's view, the goal of treatment was to provide a physical and biochemical environment that would enhance plaintiff's chance of recovery.   Dr. Wilson wanted to get plaintiff mobilized so that he could participate in rehabilitation, and he wanted to prevent agitating plaintiff by putting constraints on him.   Dr. Wilson testified in his deposition that often when restraints are placed on a patient like plaintiff, it worsens the patient's agitation and restlessness.   The safety precautions initiated for plaintiff included a bed alarm and four side rails.   Also, his bed was set on the lowest level of height adjustment.[3]   On the first evening of plaintiff's hospitalization at Mid-America on February 3, he made multiple attempts to get out of bed without assistance and pulled out his own trach.[4]

On February 4, 2003, on the Restraint and Seclusion Assessment and Physician Order Form ("Restraint Form"), plaintiff was assessed as being a danger to himself with impaired

---

[3] Plaintiff points out that the fact that plaintiff's bed was set on the lowest level of height adjustment was not a special safety measure taken for him.   It was standard practice to keep most of the patients' beds set at the lowest level, and doing so did not require a physician's order.   Also, a bed alarm does not restrain the patient.   It only tells the nurse that the patient has moved around enough in the bed to set off the alarm.   A nurse does not need a physician's order to use a bed alarm.

[4] "Trach" is the term consistently used by the parties.   The court presumes that this term means Mr. Treaster's trachea tube resulting from a tracheotomy.

memory, confused, disoriented, aggressive or destructive behavior, and he was unaware of his physical limitations.   The side rails were continued.   The nursing staff filled out an Acute Medical/Surgical Restraint Monitoring & Interventions Flow Sheet ("Acute Restraint Flow Sheet")[5] in which the effects of restraints were documented each hour.   After each assessment the nursing staff recorded that the restraints were adequate.

On the Restraint Form on February 5, 2003, plaintiff was assessed as having impaired memory, confused, and a danger to himself.   A handwritten note also stated that plaintiff was at a high risk for falls, so the side rails were again continued.   He would not stay buckled into his wheelchair that day.   He unbuckled it just as fast as the nurse fastened it.   He slid out of his wheelchair, but there is no documentation that he was injured.   The nursing staff again filled out an Acute Restraint Flow Sheet in which the effects of restraints were monitored each hour. After each assessment, the nursing staff recorded that the restraints were adequate.

On the Restraint Form on February 6, 2003, plaintiff was assessed as having impaired memory/judgment, confused, disoriented, gait/balance disorder, and a danger to himself.   At 3:15 p.m. that day, he got out of bed unassisted, fell, and was found sitting on the floor at the end of his bed.   The nursing staff recommended the use of a Vail bed.   Dr. Wilson testified in his deposition that he disagreed with this recommendation because he thought a Vail bed was inappropriate for plaintiff and probably never would have been appropriate for him.   He explained that "the whole idea with a traumatic brain-injured patient is to provide both a

_____

[5] When Dr. Wilson was caring for plaintiff he did not review the Acute Restraint Flow Sheets in plaintiff's medical charts.

physical environment and a biochemical environment that's going to enhance his recovery . . . . [a]nd if you try to restrain this type of patient, you will end up making the agitation and restlessness worse," and could result in decreased nursing care because there is less patient contact.  After plaintiff's fall, Dr. Wilson prepared new orders which discontinued the Vail bed without charting any explanation for this.  His orders continued use of the bed alarm, decreased the side rails from four to three, and changed plaintiff's medication.  Nurse Rugeania Coats charted on the Restraint Flow Sheet for that day that the restraints were adequate.  She testified in her deposition that she considers a restraint to be adequate if the patient is not trying to get out of bed; the patient does not have to actually get out of bed for the restraint to be "inadequate"; if the patient is attempting to get out of bed and is physically incapable of doing so, that would not be safe and the restraint would not be adequate.

On the Restraint Form on February 7, 2003, plaintiff was assessed as having impaired memory/judgment, disoriented, history of falls within the last 30 days, gait/balance disorder, and a danger to himself.  No new fall prevention measures were ordered.  The nursing staff again filled out an Acute Restraint Flow Sheet in which the effects of restraints were documented each hour.  After each assessment, the nursing staff recorded that the restraints were adequate.

The incident that is the subject of this lawsuit occurred on the following Saturday, February 8, 2003.  Dr. Wilson was not scheduled to work.  K. Dean Reeves, M.D. was on call for him.  On the Restraint Form that day, the following signs and symptoms were documented concerning plaintiff: impaired memory and/or judgment; disoriented; history of falls within

5

last 30 days; gait/balance disorder; and danger to self.  Between 7:00 a.m. and 4:00 p.m. on that day, plaintiff's bed alarm went off periodically.  Nurse Stacie Blackwell testified in her deposition that a bed alarm will go off if a patient merely shifts his or her weight.  Because of the repeated alarms that day, however, Nurse Blackwell formed the impression that plaintiff was trying to get out of bed as opposed to just simply shifting his weight.  But, prior to the fall that is at issue in this lawsuit, Nurse Blackwell or another member of the hospital's staff had responded quickly and successfully each time plaintiff's bed alarm went off.  Consequently, she did not feel it was necessary to notify a physician about plaintiff's attempts to get out of bed since plaintiff was "very easily redirectable," and the safety plan Dr. Wilson had put in place was working.  She stated that "we had kept him free from falls until 1600 when we had this unexpected behavior that he had not shown me earlier."

At around 10:30 a.m. that Saturday, plaintiff's bed alarm went off and Nurse Blackwell went into his room.  When she got to plaintiff, he was already out of bed, she could not support his weight, and she had to lower him to the ground.  No fall or injury occurred.

At around 4:00 p.m. that day, plaintiff got out of bed unassisted, fell, and broke his hip. Nurse Blackwell told Mrs. Treaster that plaintiff's alarm had gone off but that Nurse Blackwell was down the hallway at the time.  When she got to plaintiff's room, she found him on the floor between the bed and the bathroom.  On that day, Nurse Blackwell charted on the Acute Restraint Flow Sheet for her shift that the restraints were "adequate" up until 4:00 p.m.  The assessment for the adequacy of the restraints utilized at 4:00 p.m. was originally marked "AD" (for adequate) but it has an "I" (for inadequate) written over the "A."  Nurse Blackwell testified

6

that she acknowledged that "it looks like I wrote something over the top of it," but she did not remember doing so.

In the report of plaintiff's expert, Martin A. Schaeffer, M.D., he opines that Dr. Wilson deviated from the "dual standards of care of providing appropriate restraints for patients and the requirement of the charting of medical decision making for important medical treatment issues." Dr. Schaeffer also states that Dr. Wilson, as the hospital's medical director, has the obligation to set and implement policies and procedures with regard to fall prevention and the use of restraints. Dr. Schaeffer opined that appropriate restraints for plaintiff, given his condition and repeated attempts to get out of bed, would have been a Vail bed or a similar self-protecting device, a floor bed, a sitter (one-on-one patient monitoring), or even a right wrist restraint as was employed at St. Luke's Hospital prior to his transfer to Mid-America. According to Dr. Schaeffer, failure to provide any of these appropriate restraints breached the standard of care. Dr. Schaeffer testified in his deposition that his general criticism of Dr. Wilson "was an overall criticism of the appropriate use of restraints." He opined that, at some point "a decision should have been made to go with a higher level of restraint than either half rails or nothing." He opined that Dr. Wilson violated the standard of care by ignoring the significance of the fall and the threat to patient safety; thus, although Dr. Wilson's act of discontinuing the Vail bed was not a violation of the standard of care, he should have replaced it with a sitter or another protective device such as a floor bed. Instead, Dr. Wilson did not do anything to lessen the significant risk to patient safety.

In the report of plaintiff's nursing expert, Lynda Watson, R.N., she opines that the nursing staff did not meet the standard of care in preventing Mr. Treaster's fall. Nurse Watson states that the nursing staff failed to use adequate restrictive measures such as prompt responses to alarms, constant supervision, a Vail bed, or restraints; that they should have called plaintiff's physicians to request physician's orders for restraints or a Vail bed when plaintiff repeatedly attempted to get out of bed; and that they should have notified nursing administration and requested additional staff to supervise plaintiff when he repeatedly attempted to get out of bed and/or nursing administration should have provided staffing or other assistance needed by the nurse to ensure plaintiff's safety. Nurse Watson testified in her deposition that the nurses failed to meet the standard of care in the sense that they failed to respond promptly enough to the bed alarms, e.g., when he was found standing earlier in the day before the fall on February 8 and again when he fell before Nurse Blackwell got to him on February 8. Nurse Watson testified that, on February 8, "in addition to the bed alarm, they needed somebody at the bedside [i.e., a sitter] watching him because of his impulsiveness and because of his inability to stand up if he did get out of bed." Plaintiff's nursing expert further explained that "a more restrictive device" like a Vail bed, wrist restraint, or Posey was needed. Nurse Watson testified that the use of restraints had to be ordered by a physician, but that the facility could put in place a sitter without a physician's order.

Prior to and during plaintiff's hospitalization at Mid-America, Mid-America had a "Fall/Injury Prevention" policy as well as a restraint policy. Before plaintiff's medical experts issued their initial written reports, neither had reviewed those policies. Dr. Wilson also

8

testified in his deposition that he did not remember seeing the hospital's policies and procedures regarding the use of restraints and fall prevention. Dr. Schaeffer testified in his deposition that he could not say that any deviation from those policies by Dr. Wilson caused the fall. Although plaintiff's nursing expert had read the hospital's policies and procedures before her deposition and plaintiff's medical expert had "skim[med] through them" during his deposition, neither gave an opinion concerning their adequacy or inadequacy. Under the hospital's policies, the use and increase of restraints at Mid-America can be ordered by a physician or a nurse. If a nurse does so, a physician must sign off on the order within twelve hours.

In explaining the differences between the role of a treating physician and that of a medical director, Dr. Schaeffer testified in his deposition that based on his experience at one facility, a treating physician provides direct care to patients whereas a medical director deals with administrative services, which Dr. Schaeffer does not consider "direct patient care." When Dr. Wilson was providing direct patient care to plaintiff it was in his capacity as plaintiff's treating or attending physician. In that capacity, Dr. Wilson was part of an independent private physician's group with staff privileges at the hospital. At the same time, Dr. Wilson was also the hospital's medical director and in that capacity he was required to see that the policies and procedures of the hospital were carried out by the hospital staff, including himself. Dr. Wilson testified that as medical director he was supposed to "make sure that we were providing what was necessary to meet the needs of the patients."

Based on these facts, plaintiff asserts negligence claims against Dr. Wilson and the hospital. He asserts thirteen different negligence theories against Dr. Wilson and fourteen different negligence theories against the hospital which are set out in full below. Dr. Wilson and the hospital now move for partial summary judgment on some of plaintiff's claims against them.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).   In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.   *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."   *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324.   The nonmoving party may not simply rest upon its pleadings to satisfy its burden.   *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).   Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."   *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).   To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."   *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"   *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

11

## DR. WILSON'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff asserts the following thirteen negligence theories against Dr. Wilson.   He alleges that Dr. Wilson was negligent by:

(1)     failing to order adequate restraints or other appropriate fall prevention measures to protect plaintiff from falling;

(2)     failing to take the steps necessary to ensure that plaintiff was properly restrained;

(3)     failing to implement the hospital's policies and procedures with regard to proper and adequate fall prevention and the use of appropriate restraints;

(4)     failing to adequately and properly restrain plaintiff;

(5)     discontinuing and/or disregarding the recommendation from the hospital's staff and/or nurses that plaintiff be placed in a Vail bed;

(6)     failing to order and install a Vail bed for plaintiff;

(7)     failing to order one-on-one supervision for plaintiff to protect him from getting out of bed and falling;

(8)     failing to timely intervene and implement proper restraint measures;

(9)     failing to provide adequate supervision for plaintiff to prevent him from falling;

(10)    failing to follow and adhere to proper and applicable hospital policies, protocols, and procedures and/or the treatment plan with respect to the medical care provided to plaintiff;

(11)     failing to notify nursing administration and request additional staff to supervise

plaintiff when he repeatedly attempted to get out of bed;

(12)     failing to provide the staffing or other assistance needed by the nurse to ensure

plaintiff's safety; and

(13)     failing to properly and adequately supervise and/or monitor the nursing staff to

ensure that proper care was being provided to plaintiff.

(Pretrial Order (doc. #90), § VI(A), at 8-9.)

Dr. Wilson now asks the court to dismiss each of these claims against him except theories (1) and (5).  He contends that he is entitled to summary judgment on theories (2)-(4) and (6)-(13) because plaintiff has either failed to present expert testimony that he did not meet the standard of care and/or that some of those theories should be dismissed because they are duplicative of others.

**A.**     **Arguments Concerning Duplicative Theories**

Dr. Wilson contends that he is entitled to summary judgment on theories (2), (4), and (8) because they are duplicative of theory (1).  He also contends that he is entitled to summary judgment on theories (7) and (9) because they are duplicative of each other and related to theory (1).  The argument advanced by Dr. Wilson in this respect is not an appropriate ground for the court to grant summary judgment.  More appropriate procedural vehicles for addressing these arguments would be by way of jury instructions, Rule 59 motions at the conclusion of

plaintiff's evidence, and/or post-trial motions.   Accordingly, Dr. Wilson's motion for summary judgment on theories (2), (4), (7), (8), and (9) is denied.[6]

**B.** **Common Knowledge Exception**

In Kansas, a medical malpractice claim requires the same elements of proof as any negligence action.  *Hare v. Wendler*, 263 Kan. 434, 440, 949 P.2d 1141, 1145 (1997).  It is well established that expert testimony generally is required in medical malpractice cases to establish the accepted standard of care and to prove causation.  *Id.* at 440-41, 949 P.2d at 1145-46.  An exception arises where the lack of reasonable care or the existence of causation is apparent to the average layperson from common knowledge or experience.  *Id.* at 442, 949 P.2d at 1147.  This common knowledge exception applies if what is alleged to have occurred in the diagnosis, treatment, and care of a patient was so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally.  *Id.*

Plaintiff contends that the common knowledge exception applies in this case because Dr. Wilson's failure to protect him from falling and being injured was so patently bad as to obviate the need for expert testimony.   Notably, plaintiff raises this argument in one short

---

[6] The court notes that theories (7) and (9) are different from (1), (2), (4), and (8) in the sense that (1), (2), (4), and (8) pertain to the broader issue of the failure to implement any type of appropriate restraints whereas (7) and (9) pertain to specific types of restraints.   In this sense, theories (7) and (9) are like (6) because Dr. Schaeffer did not opine that Dr. Wilson should have ordered any specific type of restraint.   Instead, Dr. Schaeffer opined that Dr. Wilson should have ordered some type of more appropriate restraint from among those listed. Nonetheless, Dr. Wilson does not contend that he is entitled to summary judgment on theories (7) and (9) on this basis, and therefore the court confines its analysis accordingly.

section consisting of a total of twelve lines of text in his thirty-five page brief.   His argument is categorical and conclusory.   He has made no attempt to tie this contention to any of the thirteen theories of negligence he is asserting.   Based on this record and the overall thrust of his argument concerning the common knowledge exception, the court readily rejects plaintiff's reliance on the common knowledge exception at this procedural juncture because the issues of standard of care and causation would not be within the common knowledge or experience of a layperson.   At the time of the fall that resulted in plaintiff's broken hip, plaintiff was attempting to recover from a severe brain injury.   He recently had been assessed as being a danger to himself, impaired memory/judgment, confused, disoriented, gait/balance disorder, aggressive or destructive behavior, unaware of his physical limitations, and a history of falls. Dr. Wilson noted that he was confused, agitated, and restlessness.   He wanted to prevent agitating plaintiff further by putting restraints on him that would worsen his agitation and restlessness.   He wanted to create an environment that would enhance plaintiff's chances for recovery.   Thus, as plaintiff's treating physician, Dr. Wilson was confronted with the arguably competing interests of ensuring plaintiff's safety while simultaneously providing an environment which would improve his chances of rehabilitation.

The court has reviewed Kansas case law concerning the common knowledge exception and finds as a matter of law that these facts and circumstances present sufficiently complex issues concerning the standard of care and causation that the common knowledge exception does not apply here.   The most on point Kansas case is *McKnight v. St. Francis Hospital and School of Nursing, Inc.*, 224 Kan. 632, 585 P.2d 984 (1978).   In that case, a seventy-five-year-

15

old patient fell from an x-ray table.  She had been admitted to the hospital in a weakened state; was diagnosed as having hypertension, cardiovascular disease, and a mild cerebral accident; received several enemas in preparation for x-rays; and continued to complain of weakness and nausea.  *Id.* at 632, 585 P.2d at 985.  Her doctor ordered x-rays of her colon and kidneys.  *Id.* The nurse who filled out the x-ray requisition form left the "History" space on the form blank. *Id.*  After the patient was placed on the x-ray table, she fell from it.  *Id.* at 632-33, 585 P.2d at 985.   The plaintiff contended that the hospital's failure to advise the radiology department of her known weakened condition and history caused the fall.  *Id.* at 633, 585 P.2d at 985.   The Kansas Supreme Court held that, under the common knowledge exception, the plaintiff did not need to present expert testimony that the hospital had a duty to include this type of information on the x-ray requisition form.  *Id.* at 633-35, 585 P.2d at 986-87.  In *McKnight*, the failure to notify the radiology department of the plaintiff's weakened condition was so obviously lacking in reasonable care and the results were so bad that the lack of reasonable care would have been apparent to and within the common knowledge and experience of laypersons.

The nature of plaintiff's claims against Dr. Wilson in this case, however, are quite different from those in *McKnight*.  Here, plaintiff is not claiming that Dr. Wilson should have communicated the nature of plaintiff's unstable condition to someone treating plaintiff who otherwise would have been unaware of his condition.  Rather, here it seems that everyone involved in plaintiff's care and treatment was generally aware of his unstable condition.  In this case, plaintiff is claiming that Dr. Wilson himself failed to order the appropriate level of restraints.  The nature and degree of restraints which would have been appropriate and

16

commensurate with the standard of care in attempting to foster the rehabilitation efforts of a patient who recently suffered a severe brain injury simply would not have been a matter of common knowledge to laypersons. In this respect, the court notes that "the majority of jurisdictions considering the question of whether restraining a patient is, in fact, a technical medical decision have concluded that it is a complex determination, and therefore expert testimony is required to educate the jury as to the appropriate standard of care." *Banfi v. Am. Hosp. for Rehab.*, 529 S.E.2d 600, 606-07 (W. Va. 2000) (collecting cases). Given the overwhelming weight of authority on this issue, the court has no reason to believe that a Kansas court would reach a different result. Consequently, the court finds that the common knowledge exception does not apply to plaintiff's negligence claims against Dr. Wilson.

**C.    Expert Testimony on the Standard of Care and Causation**

Dr. Wilson argues that he is entitled to summary judgment on theories (3), (6), (10), (11), (12), and (13), because plaintiff has failed to adduce expert testimony that his care of plaintiff failed to meet the standard of care and/or caused plaintiff to fall. For the reasons explained below, the court agrees.

> *(3)    Dr. Wilson was negligent because he failed to implement Mid-America's policies and procedures with regard to proper and adequate fall prevention and the use of appropriate restraints.*

> *(10)   Dr. Wilson was negligent because he failed to follow and adhere to proper and applicable hospital policies, protocols, and procedures and/or the treatment plan with respect to the medical care provided to plaintiff.*

Dr. Wilson contends that plaintiff has failed to present expert testimony to support theories (3) and (10), which are based on the hospital's policies and procedures. He points out

17

that Dr. Schaeffer did not offer an opinion that Dr. Wilson failed to implement, follow, and/or adhere to the hospital's policies and procedures.   Having advanced this argument, Dr. Wilson has met his initial summary judgment burden of demonstrating the absence of a genuine issue of material fact on the standard of care and causation on these two negligence theories.   The burden, then, shifts to plaintiff to present expert testimony to withstand summary judgment on these theories.

In response, plaintiff explains that Dr. Schaeffer scanned through these policies and procedures during a break in his deposition.   He testified that Dr. Wilson should have reviewed the hospital's policies and procedures, especially important ones dealing with falls.   But, when Dr. Schaeffer was asked the following question in his deposition he answered as follows:

> Q.   Okay.   Can you state to a reasonable degree of medical probability that that caused or contributed to the injuries suffered by Mr. Treaster, that last opinion that you voiced?
>
> A.   I think it contributed to a scenario where patients were not be adequately assessed.   I can't say – I cannot say that that deviation in and of itself caused the fall.

Schaeffer Dep. at 117:23-118:5.   Plaintiff asks the court to synthesize additional evidence in the record to find support for this theory.   For example, he contends that Mid-America's policies and procedures require decisions regarding fall prevention and/or the use or non-use of certain restraints to be fully documented and charted.   He also points out that Dr. Schaeffer opined that Dr. Wilson's failure to chart his order discontinuing use of the Vail bed deviated from the standard of care requirement of charting medical decision making for important medical treatment issues.   Plaintiff discusses a variety of evidence in the record and contends

that the fact that Dr. Wilson breached the standard of care by violating the hospital's policies and procedures "is self-evident when the mandates of these policies and procedures are juxtaposed with the consistent opinions proferred by Dr. Schaeffer."

Despite plaintiff's roundabout arguments on this theory, plaintiff has failed to direct the court's attention to any expert evidence that Dr. Wilson's conduct in relation to the hospital's policies and procedures failed to meet the standard of care or caused plaintiff's injuries. Dr. Schaeffer specifically testified in his deposition, and he may so testify at trial if it is otherwise relevant, that Dr. Wilson should have been more familiar with the hospital's fall prevention policies and procedures, but not that his behavior in that regard fell below the standard of care. Moreover, Dr. Schaeffer's expert report stated that Dr. Wilson deviated from the standard of care by failing to chart his decision to discontinue use of the Vail bed. But, importantly, Dr. Schaeffer's opinion in this respect was not related to the hospital's policies and procedures. Plaintiff has not directed the court's attention to any specific provision in the hospital's policies and procedures that imposes such a requirement, and therefore plaintiff has not met his burden of establishing a genuine issue of material fact on this issue. The court has independently reviewed those policies and procedures and finds no such charting requirement for discontinuation of a restraint. The most pertinent aspect of the policies and procedures seems to be in the document entitled "Use of Restraints in Non-Psychiatric Hospital or Unit," on pages 4 and 5 in the sections entitled "Documentation" and "Discontinuation." Neither of these sections state that a physician must chart the reason for his decision to discontinue use of a particular restraint. To be sure, these policies require documentation of the "[c]linical

justification for *use*" (emphasis added), but there is no explicit requirement to document the justification for discontinuation or non-use.   Thus, although plaintiff's expert has opined that Dr. Wilson fell short of the standard of care by failing to chart his reason for discontinuing use of the Vail bed, plaintiff has presented no evidence that his opinion in that respect is related to the hospital's policies and procedures.   Accordingly, Dr. Wilson's motion for summary judgment is granted with respect to theories (3) and (10).

> (6)   *Dr. Wilson was negligent because he failed to order and install a Vail bed for plaintiff.*

Dr. Wilson contends that plaintiff has failed to present expert testimony to support theory (6).   He points to the lack of expert testimony that the standard of care specifically required the use of a Vail bed.   The court has carefully reviewed the arguments in plaintiff's memorandum in opposition to Dr. Wilson's motion for summary judgment, the contents of Dr. Schaeffer's expert report, and Dr. Schaeffer's deposition testimony with respect to this issue. Dr. Schaeffer has consistently adhered to his more generalized opinion that Dr. Wilson should have ordered a Vail bed or similar self-protecting device, a floor bed, a sitter (one-on-one patient monitoring), or even a right wrist restraint.   Thus, Dr. Schaeffer has never opined that Dr. Wilson should have ordered a specific device such as a Vail bed.   The general idea advanced in theory (6) is already encompassed in theories (1), (2), (4), and (8) in the sense that ordering a specific device such as a Vail bed would have been one of the ways in which Dr. Wilson could have met the standard of care by ordering an adequate restraint.   But Dr. Schaeffer did not opine that Dr. Wilson was required to order a Vail bed in order to meet the standard of care.

Accordingly, although Dr. Schaeffer certainly may testify at trial that Dr. Wilson should have ordered a Vail bed or another of the alternatives he has identified in connection with his opinion supporting his basic contention concerning restraints or their alternatives, Dr. Wilson's motion for summary judgment is granted with respect to theory (6) as far as it being a separate stand-alone basis on which plaintiff may seek to recover.

> (11)   Dr. Wilson was negligent because he failed to notify nursing administration and request additional staff to supervise plaintiff when he repeatedly attempted to get out of bed.

> (12)   Dr. Wilson was negligent because he failed to provide the staffing or other assistance needed by the nurse to ensure plaintiff's safety.

Dr. Wilson's motion for summary judgment on theories (11) and (12) is granted for essentially the same reasons as with respect to theory (6).   Dr. Wilson points out the absence of testimony from plaintiff's expert that Dr. Wilson had a duty to provide additional staffing other than the more generalized opinion that some type of more protective device or restraint was required such as a sitter or one-on-one patient monitoring.   Because, as explained above, Dr. Schaeffer did not opine that Dr. Wilson should have ordered any particular device/restraint such as a sitter or one-on-one patient monitoring, this claim is without evidentiary support. Like theory (6), the general ideas advanced in theories (11) and (12) are already encompassed in theories (1), (2), (4), and (8) in the sense that additional staffing or other assistance would have been one of the ways in which Dr. Wilson could have met the standard of care, and Dr. Schaeffer may so testify, but there is no evidence in the record that Dr. Wilson was required to take that specific precaution in order to meet the standard of care.

21

(13)   *Dr. Wilson was negligent because he failed to properly and adequately supervise and/or monitor the nursing staff to ensure that proper care was being provided to plaintiff.*

Dr. Wilson contends that plaintiff has failed to present expert testimony to support theory (13).   He correctly points out that in Dr. Schaeffer's report and deposition, Dr. Schaeffer is critical of Dr. Wilson and the nursing staff, but Dr. Schaeffer never attributes the alleged nursing staff deficiencies to Dr. Wilson.   In response, plaintiff contends that the "evidence will be irrefutable" that Dr. Schaeffer had a duty to supervise the nursing staff and "to see that they carry out the hospital's policies and procedures regarding the use of restraints and fall prevention measures."   Such a bold, conclusory assertion that the evidence at trial will be sufficient does not satisfy plaintiff's summary judgment burden of demonstrating a genuine issue of material fact on this issue.   Again, plaintiff has failed to direct the court's attention to any expert testimony concerning the extent of Dr. Schaeffer's duty to supervise the nursing staff.   Accordingly, Dr. Wilson's motion for summary judgment is granted with respect to theory (13).

**D.    Conclusion**

In sum, with respect to Dr. Wilson's motion for summary judgment, the court rejects Dr. Wilson's arguments concerning plaintiff's arguably duplicative theories and therefore his motion is denied with respect to theories (2), (4), (7), (8), and (9).   The court also rejects plaintiff's argument concerning the common knowledge exception.   The court grants Dr. Wilson's motion with respect to theories (3), (6), (10), (11), (12), and (13) because plaintiff

has failed to present expert testimony on the standard of care and causation to support these theories.

### MID-AMERICA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The nature of plaintiff's claims against Mid-America are similar to those against Dr. Wilson. He asserts the following fourteen negligence theories against the hospital. He alleges that the hospital was negligent by:

(1)    failing to take the steps necessary to ensure plaintiff was properly restrained;

(2)    failing to go up the chain of command, seek outside review, or pursue other administrative remedies to obtain and/or implement adequate restraint measures for plaintiff to prevent him from exiting his bed and falling;

(3)    failing to implement its own policies and procedures with regard to proper and adequate fall prevention and the use of appropriate restraints;

(4)    failing to adequately and properly restrain plaintiff;

(5)    discontinuing and/or disregarding the recommendation from its staff and/or nurses that plaintiff be placed in a Vail bed;

(6)    failing to order adequate restraints for plaintiff;

(7)    failing to order and install a Vail bed for plaintiff;

(8)    failing to provide one-on-one supervision for plaintiff to protect him from getting out of bed and falling;

(9)    failing to timely intervene and implement proper restraint measures;

23

(10)   failing to provide adequate supervision for plaintiff to prevent him from falling;

(11)   failing to follow and adhere to proper and applicable hospital policies, protocols, and procedures and/or the treatment plan with respect to the medical care provided to plaintiff;

(12)   failing to call and/or notify the appropriate physicians for permission to obtain and/or implement adequate restraints for plaintiff;

(13)   failing to notify nursing administration and request additional staff to supervise plaintiff when he repeatedly attempted to get out of bed; and

(14)   failing to provide the staffing or other assistance needed by the nurses to ensure plaintiff's safety.

(Pretrial Order (doc. #90), § VI(A), at 7-8.)

Based on the facts, the hospital contends that it is entitled to partial summary judgment on certain aspects of plaintiff's claims for three reasons: (1) Kansas statutes bar plaintiff's vicarious liability claims based on Dr. Wilson's alleged negligence; (2) plaintiff's vicarious liability claims based on Dr. Wilson's alleged negligence as the hospital's medical director fail as a matter of law because plaintiff has not provided the necessary expert testimony or other sufficient evidence to support these claims; and (3) the majority of plaintiff's vicarious liability claims based on the hospital's nursing staff's alleged negligence fail as a matter of law because plaintiff has not provided the necessary expert testimony or other sufficient evidence to support those claims.

**A.      Vicarious Liability Based on Dr. Wilson's Alleged Medical Malpractice**

24

The hospital contends that under K.S.A. § 40-3403(h) and § 65-442(b), a health care facility cannot be vicariously liable or responsible for the medical negligence of another health care provider, citing *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641 (1994).  The first of these two statutes involves the Kansas Health Care Stabilization Fund.  It provides as follows:

> A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering or failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund.

§ 40-3403(h).  It is well settled that this statute "abrogates vicarious liability where both health care providers . . . are covered by the Health Care Stabilization Fund." *Glassman v. Costello*, 267 Kan. 509, 523, 986 P.2d 1050, 1060 (1999); *see generally Lemuz ex rel. Lemuz v. Fieser*, 261 Kan. 936, 933 P.2d 134 (1997) (upholding the constitutionality of this statute).

The hospital has presented an affidavit from Rita L. Noll, the chief attorney for the Kansas Health Care Stabilization Fund, in which Ms. Noll states that both the hospital and Dr. Wilson are health care providers in current compliance with the Health Care Stabilization Fund and are qualified for coverage in this case.  Given the uncontroverted evidence on this point, the court will grant the hospital's motion on plaintiff's claims to the extent that plaintiff might be seeking to hold the hospital vicariously liable for Dr. Wilson's alleged medical malpractice.  Indeed, plaintiff concedes that the hospital cannot be held vicariously liable for Dr. Wilson's alleged medical negligence when he was acting in his capacity as plaintiff's attending physician.

Plaintiff instead argues that the hospital is vicariously liable for Dr. Wilson's alleged medical negligence when he was acting in his capacity as the hospital's medical director.  In

25

support of this argument, plaintiff contends that when Dr. Wilson was acting as medical director (and thus as an agent of the hospital) he would have been acting as a hospital administrator and therefore he would not have been covered under his private practice policy. Plaintiff has not, however, produced any evidence to support this assertion. That is, he has not produced any evidence to suggest that Dr. Wilson was not covered under the Fund for acts of medical negligence,[7] even when he was acting in his capacity as the hospital's medical director. Having failed to present any evidence to controvert Ms. Noll's affidavit, then, plaintiff has failed to raise a genuine issue of material fact to preclude summary judgment on this issue. Accordingly, the hospital's motion for summary judgment is granted to the extent that plaintiff is seeking to hold the hospital vicariously liable for Dr. Wilson's alleged medical malpractice.

**B.      Vicarious Liability Based on Dr. Wilson's Alleged Negligence as the Hospital's Medical Director**

The hospital argues that it is entitled to summary judgment on plaintiff's claims based on Dr. Wilson's alleged negligence as the hospital's medical director because plaintiff has not provided the necessary expert testimony or other sufficient evidence to support these claims. The hospital directs this argument at plaintiff's negligence theories (3) and (14).

> *(3)    The hospital was negligent because it failed to implement its own policies and procedures with regard to proper and adequate fall prevention and the use of appropriate restraints.*

---

[7] The court notes that the hospital's motion for summary judgment on this issue is directed at vicarious liability for medical malpractice, not for negligent administrative acts or omissions.

The hospital contends it is entitled to summary judgment on this theory (3) because it is undisputed that the hospital already had implemented policies and procedures with regard to fall prevention and the use of restraints.   In response, plaintiff clarifies that he is not using the term "implement" here to mean "create" or "set."   Instead, he is using the term "implement" to mean "carry out" or "execute."   In this respect, he is not contending that the written policies themselves were inadequate, but rather that the hospital failed to carry out its own policies and procedures.   The hospital contends that, posed as such, this is nothing more than a medical malpractice against Dr. Wilson barred by K.S.A. § 40-3403(h).   The court disagrees.   This determination would depend on whether Dr. Wilson's alleged shortcomings in this respect were an administrative failure or a "rendering of or . . . failure to render professional services." § 40-3403(h).   The hospital originally misunderstood the nature of this claim and did not meet its initial summary judgment burden of demonstrating the absence of a genuine issue of material fact concerning whether this claim falls within the scope of § 40-3403(h). Accordingly, the hospital's motion for summary judgment on this issue is denied.

> (14)   *The hospital was negligent because it failed to provide the staffing or other assistance needed by the nurse to ensure plaintiff's safety.*

The hospital contends that it is entitled to summary judgment on this theory (14) because the plaintiff has produced no expert evidence that the hospital failed to provide adequate staffing or other assistance.   In response, plaintiff does not contend that the court should reject this argument because expert testimony was not required.   Instead, he points out that his nursing expert provided a written opinion which states that the hospital breached the

standard of care by failing "to notify Nursing Administration and request additional staff to supervise Mr. Treaster when he repeatedly attempted to get out of bed; and/or, Nursing Administration failed to provide the staffing or other assistance needed by the nurse to ensure Mr. Treaster's safety."   The hospital, however, correctly points out that Nurse Watson's opinion on this issue pertains to the deficiencies of the nursing staff.   It says nothing about Dr. Wilson's alleged failure as a medical director to provide additional staffing or "other assistance."   Having failed to present expert testimony on this issue, then, plaintiff has presented no factual basis for holding the hospital vicariously liable for Dr. Wilson's alleged negligence as the hospital's medical director in failing to provide adequate staffing or other assistance needed by the nurses to ensure plaintiff's safety.   Accordingly, the court will grant the hospital's motion for summary judgment on this issue.   The court's order granting summary judgment on plaintiff's theory (14) disposes of this claim, however, only insofar as it is based on vicarious liability for Dr. Wilson's alleged negligence because that is the scope of the hospital's motion for summary judgment on this issue.

**C.     Vicarious Liability Based on the Nursing Staff's Alleged Negligence**

   *1.     Failure to Order or Implement Restraints*

   The hospital seeks summary judgment on any claim alleging that its nurses failed to order or implement restraints.   The hospital's categorical argument in this respect is that the nursing staff did not owe plaintiff a duty to order restraints because such an order would have required a physician or nurse practitioner's order.   The standard of care which is to be applied in any given case is not a rule of law, but a matter to be established by the testimony of

competent medical experts.  *Nold ex rel. Nold v. Binyon*, 272 Kan. 87, 103, 31 P.3d 274, 285 (2001).  It is true, as the hospital points out, that plaintiff's experts agreed that nurses generally do not order restraints.  But, the court must view the evidence in the light most favorable to plaintiff at this procedural juncture.   Viewed as such, the court must focus on the fact that plaintiff's nursing expert testified in her deposition that the facility can put a sitter in place without a physician's order, and she opined in her expert report that Nurse Blackwell should have requested staffing for constant supervision.   It is unclear whether a sitter or one-on-one supervision falls within the definition of a "restraint" for which a physician's order is required. The court's resolution of this issue is further complicated by the fact that the hospital did not specify in its motion which of plaintiff's fourteen negligence theories the hospital is directing this argument toward.  For example, to the extent that the hospital is suggesting that the nurses did not need to "go up the chain of command, seek outside review, or pursue other administrative remedies to obtain and/or *implement* adequate restraint measures"—i.e., theory (2)—plaintiff has presented expert testimony to support this theory.   Specifically, plaintiff's nursing expert opined that Nurse Blackwell "should have requested physician orders for restraints."   Given the uncertain scope of the hospital's motion on this issue and the fact that genuine issues of material fact exist concerning the extent to which the nurses should have taken the initiative to meet the standard of care in imposing "restraints," the definition of which is not entirely clear from the record, the hospital's motion on this issue is denied.[8]

_____

[8] The court also rejects the parties' reliance on federal statutes and state regulations concerning patient restraints.   Neither party has established the scope of the "emergency"

29

2.      *Failure to Provide One-on-One Supervision*

The hospital contends that it is entitled to summary judgment on plaintiff's theory (8) because, although plaintiff's nursing expert said the facility can put a sitter in place, plaintiff's nursing expert is not qualified to give an opinion about medical issues.   Whether one-on-one supervision constitutes a "restraint" and whether the use of such a safety precaution is a technical medical decision are disputed issues which the court must resolve in plaintiff's favor at this procedural juncture.   Also, the hospital has not established that Nurse Watson is not qualified to give an opinion on this issue.   Certainly, it reasonably can be inferred in the absence of evidence to the contrary that as a nursing expert she is qualified to give an opinion on the adequacy of staffing for particular patients.   Accordingly, the hospital has not established that it is entitled to summary judgment on this issue and this aspect of its motion is denied.

3.      *Discontinuing or Disregarding Vail Bed Recommendations*

The hospital contends that it is entitled to summary judgment on plaintiff's theory (5) because the undisputed facts establish that Dr. Wilson discontinued use of the Vail bed.   The hospital correctly points out that plaintiff has not presented any expert testimony that the hospital's nurses failed to meet the standard of care by discontinuing or disregarding Dr. Wilson's Vail bed recommendations.   Absent expert testimony that the hospital failed to meet the standard of care in this respect, the court will grant the hospital's motion for summary

---

exception and whether it might apply in this case.   Moreover, these laws do not set forth the standard of care under the facts and circumstances of this case.

judgment on plaintiff's theory (5).    Plaintiff attempts to avoid this result by clarifying that his contention in this regard is that once Dr. Wilson committed malpractice by canceling the Vail bed, the hospital staff should have gone up the chain of command, sought outside review of the decision, or implemented other measures that did not require a doctor's order to protect the patient from falling.    This argument, however, goes to plaintiff's theory (2), not theory (5).    It does not support a separate claim by plaintiff that the hospital was negligent for discontinuing or disregarding the Vail bed recommendation.    Plaintiff has failed to demonstrate the existence of a genuine issue of material fact concerning the standard of care on theory (5).

      *4.    Failure to Follow and Adhere to Proper and Applicable Policies, Protocols, and Procedures and/or the Treatment Plan*

Lastly, the hospital contends that it is entitled to summary judgment on plaintiff's theory (11) because plaintiff has not produced any evidence to support this theory.    The court agrees.    Insofar as plaintiff is claiming the hospital staff failed to adhere to applicable policies, protocols, and procedures, the evidence pertaining to this theory is, at best, like plaintiff's theories (3) and (10) against Dr. Wilson.    That is, even to the extent that any shortfalls in charting may have fallen below the standard of care, plaintiff has failed to direct the court's attention to any expert evidence linking this failure to a violation of the hospital's policies and procedures.    For example, although plaintiff's nursing expert observed that Nurse Blackwell "did not document the individual events," and she may so testify at trial if it is otherwise relevant, Nurse Watson did not opine that Nurse Blackwell breached the standard of care by this charting inadequacy.    Insofar as plaintiff is claiming that the hospital failed to adhere to

31

the treatment plan, plaintiff has produced no expert testimony on the standard of care.  As such, the hospital is entitled to summary judgment on plaintiff's theory (11).

**D.**     <u>**Conclusion**</u>

In sum, with respect to Mid-America's motion for summary judgment, the motion is granted with respect to vicarious liability based on Dr. Wilson's alleged medical malpractice. It is also granted with respect to vicarious liability based on Dr. Wilson's alleged medical negligence as the hospital director with respect to theory (14), but not with respect to theory (3).   It is granted with respect to vicarious liability based on the nursing staff's alleged negligence with respect to theories (5) and (11), but not with respect to any other theories.


**IT IS THEREFORE ORDERED BY THE COURT** that defendants' motions for summary judgment are granted in part and denied in part as set forth above.


**IT IS SO ORDERED** this 25th day of July, 2006.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

32